# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 16, 2011      Decided October 28, 2011

No. 10-5321

SECURITIES AND EXCHANGE COMMISSION,
APPELLEE

v.

DAVID E. WHITTEMORE AND
WHITTEMORE MANAGEMENT, INC.,
APPELLEES

PETER S. CAHILL,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-00869)

*Russell G. Ryan* argued the cause and filed the briefs for appellant.

*Nicholas J. Bronni*, Attorney, Securities and Exchange Commission, argued the cause for appellee Securities and Exchange Commission. With him on the brief were *Jacob H. Stillman,* Solicitor, and *Hope Hall Augustini*, Senior Litigation Counsel. *John D. Worland Jr.*, Attorney, entered an appearance.

Before: SENTELLE, *Chief Judge*, ROGERS and BROWN, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: As part of a civil enforcement action brought by the Securities and Exchange Commission, the district court entered a disgorgement order against Peter S. Cahill imposing joint and several liability for the full proceeds of his sales of stock in a small, thinly traded corporation not listed on a major stock exchange. Cahill challenges the order principally on the grounds that the district court's disgorgement calculation was clearly erroneous in failing to account for a pre-fraud value of 32 cents per share; the disgorgement order was impermissibly punitive because it imposed liability for funds he had transferred to co-defendants; and the district court also abused its discretion in fashioning an equitable remedy by imposing joint and several liability when there was no close relationship between the defendants and apportionment was warranted.

The allegations in the complaint and evidence presented by the Commission showed that there was no reliable pre-fraud fair market value for the shares. Cahill waived his right to contest the allegations in the complaint, and he asserted his Fifth Amendment right not to introduce evidence that might incriminate him. Consequently, because Cahill presented no evidence in rebuttal, the district court did not clearly err in finding that the Commission had met its burden to show that his ill-gotten gains were the full proceeds of his stock sales at inflated prices resulting from a fraudulent "pump and dump" scheme. Neither did the district court abuse its discretion in crafting the disgorgement remedy. Inclusion of the transferred funds was consistent with our precedent. Absent any rationale for a different approach, we join other circuits in holding that the

imposition of joint and several liability for the amount ordered to be disgorged does not require proof of a close relationship among the defendants beyond their collaboration in the fraudulent scheme in violation of the securities laws. Accordingly, because Cahill's evidentiary objections are also unavailing, we affirm the order of disgorgement.

**I.**

Pursuant to 15 U.S.C. § 78u(d)(5) (2006),[1] "the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors." Section 78j(b) of Title 15, 15 U.S.C. § 78j(b) (2006), ("Section 10(b)") provides that it is unlawful for any person to "use or employ . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." The Commission's regulations at 17 C.F.R. § 240.10b-5(c) (2010) ("Rule 10b-5") provide that it is unlawful to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

This case arises from Cahill's alleged participation in a "pump and dump" scheme through which he sold a substantial number of shares in an energy company's stock at fraudulently inflated prices. Cmpl. ¶¶ 1, 13. On May 3, 2005, the Commission filed a civil enforcement action against Cahill and others ("the Whittemore defendants") seeking to permanently enjoin them from engaging in this conduct in violation of

---

[1] The relevant sections of the U.S. Code and Code of Federal Regulations have not changed since 2005, when the conduct at issue occurred.

Section 10(b) and Rule 10b-5, and to disgorge their ill-gotten gains. According to the complaint, in July 2004, Cahill, who had acquired a substantial number of the outstanding shares of Triton American Energy Corporation ("Triton"), contacted David E. Whittemore, the owner and sole employee of a voicemail marketing firm, to engage his services in transmitting voicemail messages touting Triton's stock. Cmpl. ¶¶ 11, 12. Triton is quoted on the Pink Sheets, a trading system that lists small companies that do not meet the requirements of the major stock exchanges. Cmpl. ¶ 9. The complaint alleged Cahill transferred to Whittemore 594,000 Triton shares "for his services," but Whittemore returned them to Cahill in exchange for $142,000. Cmpl. ¶ 11. In August and September 2004, Whittemore broadcasted false and misleading voicemail messages about Triton purporting to be left by accident on the recipient's answering machine. Cmpl. ¶ 12. Prior to the fraud, Triton stock had last traded at 32 cents per share with a trading volume of 10,000 shares on August 6, 2004. Cmpl. ¶ 13. As a result of the fraud, Triton shares reached a high of 97 cents per share with 756,000 shares traded on August 19, 2004. Cmpl. ¶ 13. Cahill sold 680,800 shares between August 23 and September 14, 2004, generating gross proceeds of $508,056. Cmpl. ¶ 14. Whittemore was also charged with similar misconduct regarding another company unconnected to Cahill and Triton. Cmpl. ¶¶ 15–17.

By a consent to entry of judgment, Cahill agreed that the allegations of the complaint were true for purposes of the Commission's motion for disgorgement. *See* Consent Def. Peter S. Cahill (Jan. 21, 2009 ("Cahill Consent"). He also agreed that for purposes of the disgorgement proceeding, "the [c]ourt may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn depositions or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule

56(c) of the Federal Rules of Civil Procedure." *Id* ¶ 3. He otherwise asserted his Fifth Amendment right not to present evidence that might incriminate him. The district court entered a judgment against Cahill on liability based on his consent, with a disgorgement proceeding to follow. *SEC v. Whittemore*, 691 F. Supp. 2d 198, 200 (D.D.C. 2010). Whittemore, on behalf of himself and his company, also consented to liability for the conduct alleged in the complaint.

In support of its motion for disgorgement, the Commission filed two declarations and a transcript. Andrea Bellaire, a Commission senior counsel, declared that the proceeds of the fraud were distributed through a lawyers' trust account ("IOLTA" account) on the authority of an attorney, Phillip W. Offill. Decl. Andrea Bellaire ¶ 8, Apr. 9, 2009. Bellaire stated that in August 2004, Cahill transferred 594,000 shares of Triton stock to Whittemore "in advance for his services," *id.* 12, which Whittemore later returned to Cahill in exchange for a payment of $92,000 plus an additional $50,000 for associated costs. *Id.* ¶¶ 12–14. Bellaire estimated that Cahill's proceeds from his sale of over one million Triton shares were $738,473. *Id.* ¶ 20. She stated that Cahill wired $549,300 into the IOLTA account, and that those funds were credited to Whittemore. *Id*. ¶ 21. Bellaire also stated that one of Cahill's attorneys wired an additional $78,500 to the account of Tracy Whittemore, David Whittemore's wife, in April 2005. *Id*. ¶¶ 27–29. Robert W. Lowry, a forensic securities expert, declared that "during the five weeks prior to August 18, 2004," the closing price for TRAE (Triton's trading symbol) "ranged from a low of $0.32 per share to a high of $0.50 per share," characterizing the stock as "thinly traded" and stating there was trading volume on only five of these days, totaling 22,200 shares. Decl. Robert W. Lowry ¶ 8, Apr. 3, 2009. Once the fraudulent voice messages began, Lowry explained, Titron's trading volume spiked, exceeding 750,000 shares on one day, and the stock traded in a

price range from $0.50 to $1.50 per share. *Id.* ¶ 9. Lowry also provided details on the $549,300 Cahill wired to the IOLTA account for Whittemore, *id.* ¶ 14, as well as other information on Triton's trading price and volume, *id.* Ex. 1.

The transcript offered by the Commission was of testimony of Louis N. Guidry, taken on July 28, 2005, before the Texas State Securities Board. Guidry had testified under oath that in May 2004, Cahill approached him with a proposal: If Guidry agreed to purchase for $6,000 or $7,000 Cahill's publicly traded shell company, MilitaryCollections.com, Inc., the name could be changed to Triton American Energy Corp., Guidry would be the President and CEO, and Cahill could raise money for Guidry's oil and gas exploration efforts. *See* Guidry Tr. 8–11, Jul. 28, 2005. Guidry agreed, and Cahill engineered a reauthorization for the issuance of 100 million public shares, taking as his fee 1.2 million of those shares. Guidry claimed that he had "no idea" why Cahill transferred 594,000 shares to Whittemore, nor why Cahill wrote Whittemore a check for $92,000. Guidry Tr. 31–32. Guidry professed ignorance of any scheme to pump up Triton's share price. *Id.* at 34.

The Commission argued that Cahill's cost basis for the Triton shares was zero, and that it had satisfied its burden to show a reasonable approximation of the profits causally related to the fraudulent "pump and dump" scheme by proving the gross proceeds from Cahill's sales of the shares. Noting it "had virtually no discovery from [the defendants] on these matters," Mot. Hr'g. Tr. 6, Dec. 23, 2009, the Commission insisted the burden was on Cahill to demonstrate that its calculation was not a reasonable approximation of the profit causally related to the fraud. Joint and several liability with the Whittemore defendants for the amount of the Triton stock proceeds was appropriate, the Commission argued, because Cahill was liable for the full amount of the proceeds even if he used some of them

to pay Whittemore for his role in the fraudulent scheme. *Id.* at 15–17. Further, the Commission argued that "[t]o the extent that there's any ambiguity or vagueness in [the Commission's] ability to tick and tie the dollars [that were transferred among the defendants], that burden . . . shifts to the defendant[s] [] for an important policy reason[:] [Y]ou can't reward complicated b[yza]ntine frauds that by their very nature conceal paper and money trails . . ." *Id.* at 12–13.

Cahill, in turn, argued that, assuming the truth of Lowry's declaration about the closing price of the stock prior to the fraud, the district court should assume a pre-fraud value of 32 cents in calculating the amount of profits causally connected to the fraud. Joint and several liability was inappropriate, he added, because it was clear to whom the proceeds went after the sale of shares and because there was no evidence of a close relationship or collaboration beyond the one transaction between Cahill and the Whittemore defendants, *id.* at 30, 32–33. Whittemore, on the other hand, argued that the record contained no evidence that he ever received the proceeds from the IOLTA account into which Cahill had placed the money. The Commission responded that it did not know what had happened to the money after Cahill transferred it: "[W]e don't know what happened to the money after that. We don't know how much of it made a round trip back into Mr. Cahill's pocket." *Id.* at 48.

The district court ordered Cahill to disgorge the gross proceeds of his sales of Triton stock and imposed joint and several liability with the Whittemore defendants. *Whittemore*, 691 F. Supp. 2d at 210. The district court concluded that the Commission had met its burden to offer a *prima facie* reasonable approximation of profits connected to the securities violation by showing the gross proceeds of the stock sales, and that Cahill had not satisfied his burden to rebut the showing inasmuch as he asserted his Fifth Amendment privilege and did not offer any

evidence. *Id.* at 206. Because undisputed evidence indicated that "[Cahill's] investment was nil," *id.*, the district court found that the sale proceeds were pure, ill-gotten profit. Drawing an adverse inference from Cahill's refusal to present evidence, the district court noted that "this is a civil case and these [d]efendants control the evidence." *Id.* The district court also observed that "[b]y invoking their Fifth Amendment privilege, [the defendants] have failed to present evidence that might refute the [Commission]'s allegation that they paid nothing for their stock." *Id.* The district court rejected Cahill's argument that he should not be liable for the proceeds used to pay off his co‑conspirators and imposed joint and several liability in view of the defendants' collaboration in the fraudulent "pump and dump" stock scheme. Cahill's motion for reconsideration was denied; various accounting corrections were made to the order of disgorgement. *SEC v. Whittemore*, 744 F. Supp. 2d 1 (D.D.C. 2010).

## II.

On appeal, Cahill contends that the district court erred in failing to deduct the pre-fraud value of the Triton shares from his sale proceeds in calculating the disgorgement amount. He characterizes Lowry's declaration as "confirm[ing]" that Triton had a pre-fraud market value of 32 to 50 cents per share, Appellant's Br. 5, and emphasizes, as the district court ruled, that "the proper measure of disgorgement is the value by which a stock increased during the fraudulent activity," *id.* at 28 (quoting *Whittemore*, 691 F. Supp. 2d at 204). The Commission responds that inasmuch as Cahill "had just created" the Triton listing, "there was no real market for those shares that would provide a reasonably ascertainable market value for the shares." Appellee's Br. 16.

Our review of the district court's disgorgement calculation is for clear error. *SEC v. Bilzerian*, 29 F.3d 689, 697 (D.C. Cir. 1994). Acknowledging that "separating legal from illegal profits exactly may at times be a near impossible task," this court held that "disgorgement need only be a reasonable approximation of profits causally connected to the violation." *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989). The court explained that "the government's showing of appellants' actual profits on the tainted transactions at least presumptively satisfied" the burden to show a reasonable approximation of ill-gotten gains, thus shifting the burden to the defendants to show why it was not a reasonable approximation. *Id.* at 1232. In *Zacharias v. SEC*, 569 F.3d 458, 472–73 (D.C. Cir. 2009), the court reaffirmed, at least in the absence of a request by the defendants, that it was not the Commission's burden "to determine the hypothetical market value of the [securities]" for purposes of offsetting the actual proceeds, and that "the burden of uncertainty in calculating ill-gotten gains falls on the wrongdoers who create that uncertainty," *id.* at 473. Recently, the Ninth Circuit held in *SEC v. Platforms Wireless International Corp.*, 617 F.3d 1072, 1081, 1096–97 (9th Cir. 2010), that the Commission had satisfied its initial burden by showing the proceeds from sales of newly issued shares of a Pink Sheet stock whose pre-fraud value, if any, was "speculative and small," *id.* at 1097, where the defendants failed to explain what was not profit and there was no record evidence they paid cash value.

The Commission based its claim for disgorgement of all of Cahill's sale proceeds on the absence of evidence of fair market value (as distinct from closing trade prices) of the Triton stock listed on the Pink Sheets. Cahill relies on the concurring opinion in *SEC v. UNIOIL*, 951 F.2d 1304, 1305 (D.C. Cir. 1991) (Edwards, J., concurring), and the dissenting opinion in *Zacharias*, 569 F.3d at 473 (Williams, J., dissenting in part), as

support for his position the Commission failed to meet its initial burden of proof by relying on gross proceeds. But the separate opinions assumed the existence of an ascertainable pre-fraud fair market value, *see Zacharias*, 569 F.3d at 475 (Williams, J., dissenting); *UNIOIL*, 951 F.2d at 1306, 1308 (Edwards, J., concurring), and these cases did not involve Pink Sheet stocks with no significant trading volume. As Commission counsel noted during oral argument, the evidence showed that only a small number of shares of Triton stock were traded during a 30-day period, and there was no evidence that Cahill could have sold a million shares at any price during that time. The Commission therefore met its initial burden of showing a reasonable approximation of profits causally connected to the charged fraud by identifying the proceeds from Cahill's sales of Triton stocks. *Zacharias*, 569 F.3d at 473; *see Platforms Wireless*, 617 F.3d at 1096–97.

The burden thus shifted to Cahill to demonstrate the value of the Triton stock prior to the fraud. Cahill introduced no independent evidence of the stock's market value or the value he in fact exchanged for his shares. On appeal Cahill relies on Lowry's declaration, which references five trades made in the several weeks before the fraud, ranging in price from 32 to 50 cents per share and totaling only 22,200 shares. But Lowry only discussed the low prices and trading volume of Triton stock for purposes of contrasting them with the much higher prices and volume following the fraudulent voicemail messages — temporal evidence that the fraudulent scheme caused the rapid rise in trading price and volume. *See* Lowry Decl. ¶¶ 8–9. Lowry expressed no opinion on whether 32 or 50 cents per share was a fair market value prior to the fraudulent scheme, and Cahill never asked him if either was. Considering that in this context the "burden of uncertainty . . . falls on the wrongdoers," *Zacharias*, 569 F.3d at 473, the Commission's position, that such low trading volume on an unregulated Pink Sheet stock is

insufficient to carry Cahill's burden to demonstrate the stock's pre-fraud fair market value in rebuttal, is persuasive. The Seventh Circuit explained in *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1129–30 (7th Cir. 1993), that "[t]he price in an open and developed market usually reflects all available information because the price is an outcome of competition among knowledgeable investors," *id.* at 1129, whereas "[t]he more thinly traded the stock, the less well the price reflects the latest pieces of information," *id.* at 1130.

For these reasons, we hold that the district court did not clearly err in finding that the entire proceeds from Cahill's Triton sales were ill-gotten gains, based on the Commission's presentation of a *prima facie* reasonable approximation that Cahill did not rebut.

**III.**

Cahill also contends that he should not be liable — jointly or otherwise — for funds he transferred to Whittemore and others after selling the Triton shares. Making him liable for those funds, he maintains, would turn the disgorgement order into an impermissible punitive sanction under *SEC v. First City Financial Corp.*, 890 F.2d 1215 (D.C. Cir. 1989). Cahill would distinguish the cases relied on by the district court and the Commission for the proposition that a defendant's decision to spend his ill-gotten gains is irrelevant to the disgorgement analysis. Unlike *SEC v. Levine*, 517 F. Supp. 2d 121 (D.D.C. 2007), and *SEC v. Banner Fund International*, 211 F.3d 602 (D.C. Cir. 2000), he maintains, the sale proceeds were transferred to Whittemore and others as "part and parcel of the fraudulent scheme itself," Appellant's Br. 18, not as a result of his choice to spend the money or to evade disgorgement liability. Appellant's Br. 14, 16–18. Joint and several liability for the full proceeds was also inappropriate, Cahill contends,

because he had no close relationship with the Whittemore defendants beyond the fraudulent "pump and dump" scheme.

These related contentions do not focus on the district court's factual findings in calculating the disgorgement amount, but rather on its exercise of discretion in fashioning a disgorgement remedy. Although the exclusion of transferred funds would reduce the disgorgement amount, Cahill is attempting to draw a legal distinction, based on undisputed facts, in urging this court to hold that the district court's determination of an equitable disgorgement remedy was beyond the pale. *See SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996) (citing *SEC v. Posner*, 16 F.3d 520, 522 (2d Cir. 1994)); *Hateley v. SEC*, 8 F.3d 653, 655 (9th Cir. 1993). As other circuits have held, the district court "has broad equitable power to fashion appropriate remedies" for federal securities law violations, *First Jersey Securities*, 101 F.3d at 1474, and "has broad discretion in subjecting the offending parties on a joint-and-several basis to the disgorgement order," *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997) (citing *First Jersey Securities*, 101 F.3d at 1475). In cases cited by the parties, this court has addressed challenges to the disgorgement amount and applied a clearly erroneous standard of review to the district court's factual findings, *see, e.g. Bilzerian*, 29 F.3d at 696–97; *UNIOIL*, 951 F.2d at 1305; FED. R. CIV. P. 52(a)(6). Because Cahill's challenges here present a different question, implicating the district court's choice of an equitable remedy that is "intended primarily to prevent unjust enrichment" *Banner Fund*, 211 F.3d at 617 (citing *First City Fin. Corp.*, 890 F.2d at 1231), our review is for abuse of discretion, *see First Jersey Securities*, 101 F.3d at 1475 (citing *SEC v. Posner*, 16 F.3d 520, 522 (2d Cir. 1994)).

**A**.

The transfer of funds. In *Banner Fund*, 211 F.3d at 617, this court explained that a disgorgement order pertains to "a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset," and "establishes a personal liability, which the defendant must satisfy regardless [of] whether he retains the selfsame proceeds of his wrongdoing." *Id.* (citing *SEC v. Shapiro*, 494 F.2d 1301, 1309 (2d Cir. 1974)). As the Ninth Circuit similarly concluded in *Platforms Wireless*, "[a] person who controls the distribution of illegally obtained funds is liable for the funds he or she dissipated as well as the funds he or she retained." *Platforms Wireless*, 617 F.3d at 1098.

The complaint alleged that Cahill instigated and directed the fraudulent "pump and dump" scheme and profited from it by selling his Triton shares at the resulting, highly inflated prices. Cmpl. ¶¶ 11–14. Cahill agreed these allegations were true for purposes of disgorgement, and neither evidence from Cahill nor any other source showed that any money transferred from the sale proceeds did not ultimately revert to Cahill. *Banner Fund* therefore controls.

**B.**

Joint and several liability. Cahill contends for two additional reasons that it was inappropriate for the district court to impose joint and several liability for the full proceeds of his Triton stock sales, including the amounts transferred to Offill's IOLTA account. His first reason is that it was "untimely and unfairly prejudicial" for the Commission to request joint and several liability after not doing so in the complaint. This ignores not only that the Commission made the request for joint and several liability in its motion for disgorgement, but also that the cases on which he relies pertain to new causes of action not stated in the complaint, not specific damages pertaining to a

well-pleaded claim. *See Pinkley, Inc. v. City of Frederick, Md.*, 191 F.3d 394, 399–401 (4th Cir. 1999); *Rodriguez v. Doral Mortg. Corp.*, 57 F.3d 1168, 1171–72 (1st Cir. 1995); *In re Rivinius, Inc.*, 977 F.2d 1171, 1176–77 (7th Cir. 1992); *cf. Campana v. Eller*, 755 F.2d 212, 215–16 (1st Cir. 1985). The consented-to allegations in the complaint made clear that the Commission claimed Cahill and the Whittemore defendants acted in concert in executing a single fraudulent scheme. Compl. ¶¶ 1, 11, 19, 22–23; *see also* Compl. Prayer for Relief ¶ III; *cf. Campana*, 755 F.2d at 215.

Cahill's second reason for maintaining that joint and several liability is inappropriate presents a question of first impression in this circuit. Although acknowledging that "[c]ourts have held that joint-and-several liability is appropriate in securities cases when two or more individuals or entities collaborate *or* have a close relationships in engaging in the illegal conduct," *Hughes Capital*, 124 F.3d at 455 (emphasis added) (citing *First Jersey Securities*, 101 F.3d at 1475; *Hateley*, 8 F.3d at 656); *accord SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998), Cahill maintains that, despite this repeated disjunctive articulation of the legal standard, "courts in practice require *both* a close relationship between the defendants *and* collaboration in the wrongdoing." Appellant's Br. 25.

Cahill cites three cases from other circuits affirming the imposition of joint and several liability in disgorgement for the proposition that, at least in practice, a very close relationship between defendants is required. In *Hateley*, 8 F.3d at 656, the Ninth Circuit referred to the fraudulent collaboration within a three person firm and to a close relationship between the president and executive vice president of the firm. In *First Jersey Securities*, the Second Circuit affirmed where "a firm ha[d] received gains through its unlawful conduct [and] . . . its owner and chief executive officer ha[d] collaborated in that

conduct." 101 F.3d at 1475 (2d Cir.). And in *SEC v. Calvo*, 378 F.3d 1211 (11th Cir. 2004), the Eleventh Circuit noted that both defendants "engaged in securities laws violations" — one was a "necessary participant and substantial factor" in the other's violation — and had "the requisite close relationship" because Calvo and his family had founded and maintained a 50% ownership interest in the company with which he was held joint and severally liable. *Id.* at 1216. By describing the close relationship as "requisite," *id.*, at least where the defendant had denied involvement in the stock sale following the "pump and dump" scheme, *Calvo* provides the most support for Cahill's contention regarding the propriety of joint and several liability in his case. The Ninth Circuit used the same language in addressing a similar relationship in *SEC v. JT Wallenbrock & Associates*, 440 F.3d 1109, 1117 (9th Cir. 2006).

These cases, and other circuit cases imposing joint and several liability in disgorgement, however, have repeatedly stated the requirements of collaboration and close relationship in the disjunctive, and a reading of some of the opinions suggests the courts' references to the factual existence of both requirements were descriptive rather than prescriptive. *See, e.g., First Jersey Securities*, 101 F.3d at 1475–76 (summarizing cases). To the extent the Ninth and Eleventh Circuit have taken a different view, they offer no rationale for requiring the factual existence of both requirements for joint and several liability. Indeed, in *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997), which Cahill also cites, the Third Circuit emphasized that collaboration "in a single scheme to defraud" can warrant imposition of joint and several liability and that the burden is on the wrongdoer to establish that apportioned liability is warranted, although the court went on to find both collaboration and a close relationship existed in that case. Cahill has cited no case in which a court refused to impose joint and several liability because of the absence of a close

relationship beyond the defendants' collaboration in the fraudulent scheme, and he now fails to offer a rationale for such a limitation. His approach would allow strangers who collaboratively engage in a fraudulent scheme in violation of the securities laws to escape joint and several liability merely because they were unrelated by blood or marriage or did not have the same employer. This could lead to "absurd results" no less than allowing the wrongdoer to avoid disgorgement by spending the proceeds of the fraudulent scheme, *Banner Fund*, 211 F.3d at 617. Cahill essentially ignores the deterrent purpose of disgorgement. *See First City Fin. Corp.*, 890 F.2d at 1230.[2] We join the circuits that view the requirements for joint and several liability in the disjunctive.

The complaint alleged, and Cahill agreed, that Cahill transferred shares between participants in the "pump and dump" scheme, compensated Whittemore and his company for the false voice messaging services, and sold stock at inflated prices resulting from the fraudulent scheme. Compl. ¶¶ 11–14. Once the Commission established the close collaboration between Cahill and the Whittemore defendants in the fraudulent scheme, the burden was on Cahill to establish that apportionment was

[2] Cahill advances several policy reasons why a court should hesitate to impose joint and several liability in a Commission civil disgorgement action. In his view, the concerns underlying apportionment among tortfeasors are irrelevant where the Commission is seeking the equitable remedy of disgorgement in a law enforcement context inasmuch as the Commission is not an injured victim and this court has emphasized that the purpose of disgorgement is not to compensate for losses but to deprive the wrongdoer of his ill-gotten gain, *see, e.g., Zacharias*, 569 F.3d at 471. Congress has resolved the policy question: "The dominant congressional purposes underlying the Securities Exchange Act of 1934 were to promote free and open public securities markets and to protect the investing public." *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 858 (2d Cir. 1968) (en banc).

warranted, *see Hughes Capital*, 124 F.3d at 455, and Cahill failed to do so. Placement of this burden on the defendant is justified because, the Third Circuit explained, "[v]ery often defendants move funds through various accounts to avoid detection, use several nominees to hold securities or improperly deprived [sic] profits, or intentionally fail to keep accurate records and refuse to cooperate with investigators in identifying illegal profits." *Id.* The Bellaire and Lowry declarations describing various wire transfers did not preclude such a possibility here. In relying on the Lowry Declaration, which described a series of wires sent by Cahill to Offill's IOLTA account, Cahill failed to rebut that, according to their attorney, there was "no evidence in the record that the Whittemore defendants received most of that money or that they benefitted from it or that the money that they did receive was tied to . . . the alleged fraud. . . . Mr. Lowry's affidavit never concludes that Mr. Whittemore actually received any of it." Mot. Hr'g Tr. 43. Although there was evidence Cahill transferred some of the proceeds for Whittemore's benefit, *see* Bellaire Decl. ¶¶ 20–21, Cahill never established where the ill-gotten gains finally came to rest. Unlike in *Hateley*, where "the very agreement that [was] the source of their liability" obligated the defendant to pay the other defendants 90% of the ill-gotten gains, 8 F.3d at 655, no such arrangement was shown by Cahill, and he failed to establish any alternative evidentiary basis for apportionment.

Because Cahill wrongfully obtained the proceeds of the Triton stock sales and controlled the distribution, if any, of those proceeds, and because he collaborated with the Whittemore defendants in the fraudulent "pump and dump" scheme, we hold that the district court did not abuse its discretion in requiring a disgorgement of the gross proceeds of Cahill's sales of Triton stock and in imposing joint and several liability.

18

**IV.**

Finally, Cahill contends that the district court improperly "drew a heavy adverse inference" against him for his decision to take the Fifth Amendment. Appellant's Br. 41. The Fifth Amendment, however, "has never been thought to be in itself a substitute for evidence that would assist in meeting a burden of production." *United States v. Rylander*, 460 U.S. 752, 758 (1983). Cahill had the burden of rebutting the Commission's reasonable approximation of his ill-gotten gains with evidence of the pre-fraud value of, or the value he exchanged for, his Triton shares; his invocation of the Fifth Amendment could not compensate for his failure to meet this burden, irrespective of any adverse inference the district court might have drawn from it. Cahill concedes that an adverse inference is permissible in civil cases when "independent evidence exists of the fact to which the party refuses to answer." Appellant's Br. 41 (quoting *Doe v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000)). In the absence of Cahill's production of any evidence to the contrary, documentary or otherwise, the district court could properly credit the Commission's evidence to draw an adverse inference from Cahill's failure to discredit it. *See, e.g.*, *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 909, 914 (9th Cir. 2008).

Cahill maintains, however, that the Guidry transcript offered by the Commission was inadmissible and unauthenticated hearsay. He asserts that although Guidry was available to testify, the Commission neither produced the transcript during discovery nor sought to depose him. He also focuses on "the unfairness associated with [the transcript's] 13th-hour unveiling" by the Commission. Appellant's Br. 45. The Commission responds that Cahill has waived any hearsay objection by consenting to the use of "affidavits, declarations, excerpts of sworn depositions or investigative testimony, and documentary evidence without regard to the standard for

judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure." Appellee's Br. 35; *see* Cahill Consent ¶ 3; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

Even assuming Cahill presented a valid hearsay objection not foreclosed by the consent agreement, he fails to show that admission of Guidry's testimony over his objection affected his "substantial rights," *see* 28 U.S.C. § 2111; FED. R. CIV. P. 61, and therefore fails to show he is entitled to reversal of an "otherwise valid judgment," *Whitbeck v. Vital Signs, Inc.*, 159 F.3d 1369, 1372 (D.C. Cir. 1998). The declarations offered by the Commission and the allegations in the complaint identify the proceeds from Cahill's sales of Triton stock after the broadcast of the false voicemails. *See* Bellaire Decl. ¶ 20; Lowry Decl.¶ 13; Compl. ¶ 14. This other evidence established the lack of an ascertainable pre-fraud fair market value for the stock, *see* Compl. ¶ 13; Lowry Decl. ¶ 8, thereby satisfying the Commission's initial burden in reasonably approximating his illegal profits. Because Cahill failed to meet his burden of resolving any uncertainty regarding that value, or the value he in fact exchanged for his shares, the district court could properly accept as reasonable the Commission's approximation of Cahill's ill-gotten gains without regard to Guidry's testimony. Indeed, this is what the district court did. *See Whittemore*, 691 F. Supp. 2d at 206–07. Because Guidry's testimony was not determinative in the district court's disgorgement calculation, its admission, if error, was harmless. *See First City Fin. Corp.*, 890 F.2d at 1225.

Accordingly, we affirm the order of disgorgement.