PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 12-1168
_____

SECURITIES AND EXCHANGE COMMISSION

v.

ALFRED S. TEO, SR.; TEREN SETO HANDELMAN;
MAAA TRUST, FBO MARK, ANDREW, ALAN AND
ALFRED TEO, JR.; JOHN D. REIER; CHARLES D.
FORTUNE; JERROLD J. JOHNSTON; MARK J. LAUZON;
PHILIP SACKS; MITCHELL L. SACKS; RICHARDA.
HERRON; LAWRENCE L. ROSEN; DAVID M. ROSS;
JAMES M. RUFFOLO

Alfred S. Teo, Sr. and MAAA Trust,
Appellants
_____

On Appeal from the United States District Court
for the District of New Jersey

(D.C. No. 2-04-cv-01815)
District Judge:  Honorable Susan D. Wigenton

ARGUED APRIL 23, 2013

BEFORE: SLOVITER, JORDAN, and NYGAARD, *Circuit Judges*

(Filed: February 10, 2014)

Eric O. Corngold, Esq.
Mary E. Mulligan, Esq.
Friedman Kaplan Seiler & Adelman
7 Times Square
New York, NY  10036

Cheryl A. Krause, Esq.  [Argued]
Dechert
2929 Arch Street
18th Floor, Cira Centre
Philadelphia, PA  19104

> *Counsel for Appellants Alfred S. Teo, Sr. and MAAA Trust*

David Lisitza, Esq. [Argued]
Securities & Exchange Commission
100 F Street, NE, Mail Stop 1090
Washington, DC  20549

> *Counsel for Appellee*

_____

OPINION OF THE COURT
_____


NYGAARD, *Circuit Judge.*

A jury concluded that defendants Alfred Teo and MAAA Trust were liable for violating (inter alia) the Securities Exchange Act of 1934, Sections 13(d) and 10(b) (15 U.S.C. § 78m(d) and § 78j(b)). The District Court subsequently denied the Defendants' motions for judgment as a matter of law and for a new trial. It also ordered (inter alia) the Defendants to disgorge over $17 million, plus prejudgment interest amounting to over $14 million. They now appeal alleging errors arising from the admission of certain evidence and the use of a general verdict form; and challenging the District Court's disgorgement and prejudgment interest award. We will affirm the District Court's order on all issues.


I.

Alfred Teo is a businessman and an investor. In 1992, he established the MAAA Trust. Teo was the beneficial owner of the Trust, which also held various securities, for the period relevant to this appeal. In February 1997 twenty-eight brokerage accounts controlled by Teo (including those of the Trust) held approximately 5.25 percent of the stock in Musicland. Musicland was a Delaware corporation that was a

3

retailer of music, video, books, computer software and video games.

Musicland had a "shareholder rights plan" that could be activated when an individual or group reached 17.5 percent ownership of the company's stock. This plan, commonly known as a "poison pill," was in place to protect the company from a hostile takeover. Once initiated, it enabled—among other things—shareholders to purchase stock at a lower price to dilute the holdings of the hostile buyer to a lower percentage.

Up to July 1998, in accord with Section 13(d), Teo properly disclosed his Musicland holdings on SEC Schedule 13D, and those holdings were under the poison pill threshold. On July 30, 1998, Teo filed "Amendment 7" to his Schedule 13D disclosure with the following statement: "Teo ceased to have investment powers with respect to the [MAAA] Trust." [1] After July 30, 1998 Teo consistently reported that his ownership percentage in Musicland remained below 17.5 percent. Nonetheless, he continued to make investments in Musicland on behalf of the Trust. In all, Teo filed three false Schedule 13D disclosures, and he failed to file numerous 13Ds that were required when the change in the percentage of his ownership in Musicland exceeded the reporting threshold.

---

[1] Schedule 13D requires the disclosure of (inter alia): the identity of the purchaser, including beneficial owners; a description of the purpose of the purchase(s), including any plans or proposals to change the Board of Directors or to cause an extraordinary corporate transaction; and, the interest of all persons and groups making the filing. 17 C.F.R. § 240.13d-101. (1997))

4

The Trust subsequently filed two Schedule 13Ds falsely stating that Teren Seto Handeleman, Teo's sister-in-law, had sole power to buy and sell Trust shares. By failing to disclose his beneficial ownership of the Musicland stock held by the MAAA Trust, Teo under-reported his Musicland holdings, and failed to comply with his reporting obligations under Section 13(d). Moreover, since Teo's filings never disclosed his ownership of Musicland stock to be at or above the poison pill threshold, Musicland was kept in the dark about this fact and it never activated this plan. This was Teo's intent for filing the false reports.

Additionally, after March 10, 2000, the Trust stopped making amendments to its reports, even though changes in its Musicland ownership interest continually exceeded the reporting threshold. The District Court concluded that Teo and the Trust controlled 17.79 percent of Musicland shares on August 2, 1998, and 35.97 percent on December 6, 2000. Their combined holdings in Musicland did not fall below 17.79 percent through January 31, 2001.

Throughout this period, Teo made multiple requests to be placed on the Musicland Board of Directors (from December 1998 through September 2000), and during 2000 he also pushed, unsuccessfully, for the selection of a number of other Board candidates. Moreover, Teo repeatedly proposed that Musicland become privately held. Teo successively worked with Goldsmith-Agio-Helms, Trivest Capital, and Financo on plans to take Musicland private. He admitted that his motive for doing so was to open up the opportunity for him to cash out. He did not file any Schedule 13D disclosures on any of these activities.

In December 2000, Best Buy Co. announced its all-cash tender offer of all Musicland shares, and it acquired those shares in January 2001. The stock price rose after the tender offer announcement.[2] Teo sold a portion of his Musicland shares in the market, and all of the remaining shares to Best Buy as part of the tender offer. The District Court determined that Teo's original cost of acquiring his shares was $89,453,549 and that the gross proceeds from his sale of the stock amounted to $154,932,011. The District Court set Teo's profit from stock he held after July 30, 1998, (taking into account the date of his first SEC reporting violation) at $21,087,345, including shares held by the Trust, and those held by accounts that Teo directly controlled.

In April, 2004 the SEC filed a civil law enforcement action against Teo asserting violations of the Securities Exchange Act, Sections 13(d) and 10(b), and numerous SEC rules and regulations.[3] The District Court granted summary judgment on a number of rule-violation claims that Teo does not challenge. At trial, a jury concluded that Teo violated Section 10(b) and Rule 10b-5, and that Teo and the Trust violated Section 13(d), Rule 12b-20, Rule 13d-1, and Rule 13d-2. Finally it held that the Trust violated Section 16(a) and Rule 16a-3.

---

[2] Teo admits that, in the fall preceding the Best Buy deal, he received confidential communications about it from senior management at Musicland and he subsequently bought 45,000 additional shares of Musicland stock.

[3] In August, 2004, the Government indicted Teo. He pleaded guilty to insider trading, in violation of 15 U.S.C. §§ 78j(b) and 78ff(a) in June 2006.

After trial, the District Court denied motions by Teo and the Trust for a new trial and for judgment as a matter of law. It subsequently enjoined Teo and the Trust from future violations of securities law. Finally, upon the SEC's motion, the District Court held Teo and the Trust jointly and severally liable for paying the civil penalty and for the disgorgement of their illegally obtained profits.

Teo and the Trust now appeal the jury's verdict, but do not directly challenge the ruling on the injunction or their joint and several liability. Specifically, they appeal the District Court's admission of Teo's guilty plea allocution and an exhibit that they assert is false evidence. They also claim that there was insufficient evidence to prove a "plans and proposals" theory of liability, and that this entitles them to a new trial because the general verdict slip creates ambiguity on the theory of liability grounding the jury's verdict. Finally, the Appellants appeal the District Court's order disgorging over $17 million, plus prejudgment interest.[4] We now turn to each of these issues.

II.

---

[4] The District Court subtracted both amounts paid by the Appellants in margin interest, and profits attributable to Teo's insider trading from the total amount to be disgorged, reducing the disgorgement from $21,087,345 to $17,422,054.13.

7

On June 7, 2006, Teo pleaded guilty to five counts of insider trading admitting that: he received advance information that Best Buy was going to make a tender offer to purchase Musicland stock; that he was aware that this was private information; he was aware of his duty to refrain from acting on or disclosing it to anyone; and finally, that he enabled eight people to take advantage of this information. He also admitted that he passed this information on to the eight willfully, knowingly and with an intent to defraud. The conduct underlying these admissions occurred contemporaneously with his Section 13(d) violations in the fall of 2000. The SEC's use of the admissions contained in the allocution was the subject of a motion in limine, and the District Court ruled that—presuming Teo testified—it was admissible.

During the SEC's questioning of Teo at trial, it introduced—over the Appellants' objections—Teo's convictions and the allocution from his guilty plea to Section 10(b) insider trading. The Appellants now take issue only with the admission of the allocution.[5]

The District Court grounded its decision to admit Teo's allocution on both Fed. R. Evid. 609 and Fed. R. Evid.

---

[5] Teo argues that we should apply a de novo standard of review. We review de novo "whether evidence falls within the scope of Rule 404(b)," but since we regard the allocution at issue to be appropriately considered in the context of Rule 404(b), we apply an abuse of discretion standard. *United States v. Ciavarella*, 716 F.3d 705, 727 n.12 (3d Cir. 2013).

404(b).[6]Under Rule 404(b), evidence of a crime may not be used to prove a person's character, but may be used to prove intent, knowledge, absence of mistake, or lack of accident. We have long regarded this rule as inclusionary, meaning that "evidence of other wrongful acts [is] admissible so long as it [is] not introduced *solely* to prove criminal propensity." *United States v. Green,* 617 F.3d 233, 244 (3d Cir. 2010). Moreover, we have adopted a four-prong test for admissibility under Rule 404(b): (1) the evidence must have a proper purpose under Rule 404(b); (2) it must be relevant under Rule 402; (3) its probative value must outweigh its prejudicial effect under Rule 403; and (4) the court must charge the jury to consider the evidence only for the limited purpose for which it was admitted. *United States v. Davis,* 726 F3d 434, 441 (3d Cir. 2013).

---

[6] Rule 609(a)(2) states: **"**[F]or any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving--or the witness's admitting--a dishonest act or false statement." Teo challenges the admission of the allocution on Rule 609, asserting that we have limited the admission of such evidence to the "number of convictions, the nature of the crimes, and the time and date of each." *United States v. Mitchell*, 427 F.2d 644, 647 (3d Cir. 1970). Rule 609 was the basis for admitting Teo's insider trading conviction (which is uncontested), but we need not address the admissibility of the allocution under Rule 609 because we conclude that Rule 404(b) provided the court with a solid foundation for its decision.

The District Court, after reviewing the proposed evidence, concluded that the allocution would be probative of virtually all of the permissible reasons provided under Rule 404(b): Teo's claimed absence of knowledge, his intent, and the absence of mistake. It noted that the criminal case was "an offshoot" of the civil case, and that this evidence was relevant to "what [Teo] knew, what [Teo] did, [and] when he did it." We agree. The allocution was probative of Teo's willfulness and knowledge in evading SEC regulations as they related to his Musicland stock holdings.

The Appellants attempt to construe the insider trading conduct as irrelevant because it was subsequent to the acts underlying the issues raised in the civil trial. This is factually incorrect. The criminal acts occurred between September and December of 2000, the same time as some of the acts at issue here. Moreover, the criminal and civil misconduct are all connected to Teo's failure to comply with securities laws vis-a-vis his Musicland holdings. Particularly in the circumstances of this case, his admissions about his intent in the criminal matter were probative of his intent in the civil case. This is true whether or not some of the conduct addressed in the civil suit predated the acts referenced in the allocution. *See United States v. Bergrin*, 682 F.3d 261, 281 n. 25 (3d Cir. 2012). We find no error in the District Court's determination of relevance.

The District Court also demonstrated an awareness of the potential for prejudice by noting from the outset that a limiting instruction would be necessary. Highlighting that this evidence "goes to the heart of the very issues are [sic] in this case," the District Court concluded that "while its prejudicial, I don't believe that the prejudicial effect

10

substantially outweighs the probative value." Again, we agree. Particularly in light of the fact that Teo's insider trading convictions were also part of the record (and are not appealed) we see no error by the District Court.[7]

Finally, citing to *Becker*, the Appellants argue that the limiting instruction was inadequate. *Becker v. ARCO Chemical Co.,* 207 F.3d 176 (3d Cir. 2000). In *Becker*, the district court admitted evidence of an employer's prior fabrication of a pretext for terminating an employee as relevant to a plan, pattern or practice in the case at bar, even though the event was completely unrelated. *Id.* at 190-91. It then provided a "cursory" limiting instruction to the jury about this evidence. We reversed, partially due to the inadequate instruction. *Id.* at 206. This case is distinguishable on the relevance of the evidence. Moreover, the instruction need not contain any particular language, as long as it adequately prevents unfair prejudice. *See United States v. Daraio,* 445 F.3d 253, 265 (3d Cir. 2006). The District Court here did more than simply repeat the words of the rule, providing a meaningful delineation of character evidence from evidence that goes to intent and the absence of mistake. Moreover, the instruction captures the key points of this Court's Model Jury Instructions. *See* Court of Appeals

---

[7] The Appellants complain, among other things, that the SEC's use of the allocution at the end of its cross examination was particularly prejudicial because it was more likely to make an impression on the jury. However, so long as the evidence raised in the cross-examination was admitted and used for a permissible purpose, counsel is free to organize its examination of the witness in any manner it sees fit.

11

for the Third Circuit Model Jury Instruction § 4:29. Specifically, it said:

> Mr. Teo is not on trial for insider trading. You may not consider this evidence as proof that Mr. Teo has a criminal personality or bad character. This evidence is being admitted for more limited purposes; namely whether Mr. Teo knowingly and intentionally, with a plan and motive, committed the acts alleged in this and did not act because of mistake, accident or other innocent reason

We do not see any error in the District Court's limiting instructions.

As a result, we conclude that the balancing test of Rule 403 supports a conclusion that any prejudice arising from the admission of the allocution was both outweighed by the probative value of the evidence and was properly limited by the instruction. For all of these reasons, the District Court did not abuse its discretion by admitting the allocution under Rule 404(b).[8]

---

[8] Even if the admission of this evidence had been error, we would have ruled that it was harmless. The Appellants have not appealed the District Court's admission of Teo's judgment of conviction on insider trading, which of itself placed before the jury much of the potentially prejudicial information about which the Appellants now complain.

III.

The Appellants next claim that the SEC provided false evidence to the jury, and that the District Court abused its discretion by denying their motion for a new trial on this basis. The issue centers on an exhibit, PX103, that contained both a fax cover sheet and a marked-up draft of an amendment ("Amendment 7") that Teo made to his Schedule 13D filing. The Appellants complain that the SEC knowingly presented this exhibit to the jury as one continuous document, ostensibly faxed by Teo's counsel to Teo, when in fact the marked-up document was never faxed.[9]

---

Moreover, with the accumulation of other evidence on Teo's intent regarding the reporting violations, we are hard pressed to find any credible basis to rule that the allocution was substantially prejudicial to the Appellants.

[9] The District Court authenticated the exhibit, which was included in the Joint Proposed Final Pretrial Order, without objection from the Appellants. Accordingly, as per the agreement of the parties upon their submission of the joint proposed order, the Appellants waived their appeal of this issue. However, the District Court did not treat the issue as waived when considering the Appellants' motions for judgment as a matter of law and for retrial. Regardless, we conclude that the Appellants' assertion of false evidence is meritless.

We review the denial of a motion for a new trial for abuse of discretion. *McKenna v. City of Philadelphia,* 582 F.3d 447, 460 (3d Cir. 2009). A new trial is warranted when the government, "although not soliciting false evidence, allows it to go uncorrected when it appears at trial." *United States v. Biberfeld,* 957 F.2d 98, 102 (3d Cir. 1992). The concept of false evidence is most often associated with instances of perjured testimony (*See e.g. Lambert v. Blackwell,* 387 F.3d 210, 242 (3d Cir. 2004)) and it is, to say the least, a stretch to apply it to the facts of this case.

The exhibit at issue was comprised of two documents that Teo submitted to the Government during his criminal prosecution in response to a motion to compel. The first document is a fax cover sheet indicating that Teo's counsel sent Teo a copy of Amendment 7 for his review prior to its submission to the SEC. The second document is a marked-up draft of Amendment 7 prepared by Teo's counsel. There is no dispute that the marked-up draft was not the document that was referenced in the fax cover sheet. In fact, there is no evidence that counsel ever gave the marked-up draft to Teo.

Yet, Teo's counsel was the originator of the documents, having submitted the fax cover sheet and marked up document in response to a motion to compel during the criminal prosecution. The Appellants have never disputed that Teo reviewed a document that is substantially similar to the marked-up version included in the exhibit. Therefore, it is not an exaggeration to say that, from the time of its production, Teo has been complicit in the conclusion that the marked-up version was substantially the same as what Teo reviewed prior to its submission. While the Appellants timely objected to the SEC's use of the exhibit at trial, no one—

14

particularly Teo—said at any time that any of the statements from the exhibit that the SEC referenced while Teo was testifying were incorrect or misrepresented.  Teo testified that he knew the contents of the amendment at issue and was aware that, as a result of filing this amendment, the public would believe that he no longer had beneficial ownership of Musicland stock purchased by the Trust.

While the exhibit theoretically could have created confusion, there is no evidence that it actually did, nor is there any evidence that it influenced the outcome of the trial.  The SEC never represented to the jury, willfully or otherwise, that the exhibit was one continuous document.  Moreover, any mistaken inference about the documents in the exhibit was adequately highlighted by the Appellants during trial and explained to the jury.  The District Court permitted the Appellants to distribute copies of the entire exhibit to the jury, pointing to irregularities in pagination.  As a result, to the extent that the formatting of the exhibit could have created a mistaken impression that the marked-up draft was faxed to Teo, the jury was fully apprised of the potential for this error.

Even if the combination of the two documents in one exhibit confused the jury—a contention for which we have no evidence—we do not have any basis to conclude that the exhibit prejudiced the outcome of the trial.  To the contrary, there was other evidence before the jury concerning Teo's awareness of his representations to the SEC.  Therefore, if there was any error in admitting this exhibit, it was harmless. *See United States v. DeMuro,* 677 F.3d 550, 557 (3d Cir. 2012).  For all of these reasons, as to Exhibit PX103, we conclude that the District Court did not abuse its discretion by refusing to grant a new trial on this basis.

IV.

The Appellants next contend that the District Court erred by denying their motions for judgment as a matter of law and for a new trial that claimed insufficient evidence. In a challenge to the District Court's denial of judgment as a matter of law, we exercise plenary review, applying the same standard as the trial court. *Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 492 (3d Cir. 2002).

The SEC asserted at trial that the Appellants violated Section 13(d) by failing to disclose plans and proposals for an extraordinary corporate transaction, and to change the Board of Directors.[10] Appellants first assert that, regarding the District Court's review of their challenge to the sufficiency of the evidence on the SEC's plans and proposals theory, the District Court actually assessed the materiality of the evidence and mistook this for a review of sufficiency. This

---

[10] Schedule 13D, Item 4 states: "State the purpose or purposes of the acquisition of securities of the issuer. Describe any plans or proposals which the reporting persons may have which relate to or would result in: . . . (b) An extraordinary corporate transaction, such as a merger, reorganization or liquidation, involving the issuer or any of its subsidiaries; . . . (d) Any change in the present board of directors or management of the issuer, including any plans or proposals to change the number or term of directors or to fill any existing vacancies on the board." 17 CFR § 240.13d-101 (1997).

error, they claim, undermines the District Court's conclusion that there was sufficient evidence on this theory of liability.

This assertion alone would be of no moment in many cases, because motions for judgment as a matter of law are to be denied "if there is evidence reasonably tending to support the recovery by plaintiff as to any of its theories of liability." *Walmsley v. City of Philadelphia,* 872 F.2d 546, 551 (3d Cir.), *cert. denied,* 493 U.S. 955 (1989) (citation to quotation omitted). Yet, we have also ruled that: "Where a jury has returned a general verdict and one theory of liability is not sustained by the evidence or legally sound, the verdict cannot stand because the court cannot determine whether the jury based its verdict on an improper ground." *Wilburn v. Maritrans GP Inc.*, 139 F.3d 350, 361 (3d Cir. 1998). Therefore, since the jury used a general verdict form in this case, the Appellants would receive a new trial if they were correct that the District Court both conducted a faulty review and reached the wrong result on the Appellants' sufficiency of the evidence claim. However, the District Court's use of a general verdict form does not impact our ruling here because we conclude that the District Court's analysis of the SEC's plans and proposals theory of liability was not erroneous.

The District Court said: "[T]he jury had sufficient evidence upon which to determine whether Teo's plans and proposals regarding Musicland would have resulted in an extraordinary corporate transaction . . . .[or] a change to the board of directors." The Appellants seize upon the words "would have resulted," and claim that the District Court ignored whether the evidence substantially showed "concrete" plans and proposals (*See Azurite Corp. Ltd. v. Amster & Co.,* 52 F.3d 15, 18 (2d Cir. 1995)), and instead

mistakenly focused merely upon the materiality of the evidence to the plans and proposals theory.[11] As a result, they claim that evidence suggesting nothing more than "embryonic" plans by Teo was mistakenly regarded as sufficient to ground the jury's decision. This misconstrues the District Court's analysis.

The District Court, quoting *Azurite*, established the basis for its review of the Appellants' motions by noting that "section 13(d) does not require disclosure of 'preliminary considerations, exploratory work or tentative plans.' *Azurite Corp Ltd. V. Amster & Co.*, 844 F. Supp. 929, 934 (S.D.N.Y. 1994).'" Borrowing further from *Azurite*, the District Court noted that "[p]lans or proposals should be disclosed where a course of action has been decided upon or intended." The District Court made clear that this was the standard it used to assess the evidence.

As to the record, the District Court highlighted the following facts. In 1999 Teo met with representatives of Goldsmith-Agio, who produced a financial analysis of a proposal to privatize Musicland and discussed it in a meeting with both Teo and Musicland. Musicland rejected this proposal. Undeterred, Teo met with representatives of Trivest in early 2000 and signed a term sheet. Trivest and Teo met with Musicland to discuss the plan. Again, Teo was not successful. However, in August of 2000 Teo began discussions about his privatization plan with a number of

---

[11] The SEC does not contest the Appellants' reliance on *Azurite* to express the appropriate standard for determining whether a particular plan or proposal is sufficiently formed to trigger reporting requirements under item 4 of Schedule 13D.

businessmen, culminating in meetings with a third investment bank—Financo. Teo terminated this collaboration when he learned that Musicland was in negotiations to be sold. The District Court concluded that Teo's serial efforts with three investment banks to find backing for a leveraged buyout of outstanding Musicland stock was substantial evidence for a jury to conclude that Teo had a plan or proposal for an extraordinary corporate transaction.

As to evidence relating to the Board of Directors, the District Court detailed Teo's numerous conversations with Musicland representatives both about his intention to become a Board member and about his intent to have three of his associates placed on the Board. He sent the resumes of these individuals, along with his written request for them to be placed on the Board, to Musicland representatives. These efforts spanned from 1998 up through 2000. In fact, Teo made a request to be on the Musicland Board once a month during 2000.

In consideration of all of this, we understand the District Court's holding to be that, in spite of Teo's overall lack of success in his privatization efforts, the record contained sufficient evidence for the jury to conclude that Teo had decided upon or intended a course of action for an extraordinary corporate transaction and to change the Board of Directors, triggering a Schedule 13D reporting duty. We do not see any error in the District Court's conclusion that substantial evidence supported the jury's decision.

As a result, we do not face the situation confronted in *Wilburn*, where a general verdict left open the possibility that one of the plaintiff's theories of liability for which there was

insufficient evidence might have been the one on which the jury grounded its determination of liability. Here, as the District Court held, sufficient evidence supported the jury's verdict holding the Appellants liable for Section 13(d) violations, regardless of whether it relied upon the plans and proposals theory. Therefore, we conclude that the District Court did not err by denying the Appellants' motions for judgment as a matter of law and for a new trial. [12]

V.

Teo and the Trust next challenge the District Court's order to disgorge $17,422.054.13 in profit from transactions tainted by their violation of the Securities Exchange Act. The Appellants do not appeal the calculation of the disgorgement, but rather assert the District Court wrongly granted the SEC's motion for this remedy. We review for an abuse of discretion. *SEC v. Hughes Capital Corp.,* 124 F.3d 449, 455 (3d Cir. 1997).[13]

---

[12] Appellants also contend that cumulative evidentiary errors support reversal even though, individually, there is no reversible error. We reject this argument because no such cumulative error exists here.

[13] Teo does not, as he did before the District Court, make an alternative argument challenging the District Court's calculation of the disgorgement which would have been subject to a clear error review. *SEC v. Whittemore,* 659 F.3d 1, 7 (D.C. Cir. 2011).

The Appellants note that the profits to be disgorged by the District Court's order resulted solely from the sale of the Musicland shares under Best Buy's tender offer. They assert that the tender offer had nothing to do with their violations of Section 13(d) and Section 10(b), and that the District Court's ruling is in error because it ignores the tender offer as the proximate cause of their profits. The Appellants argue that the District Court should have required the SEC to demonstrate that disgorged profits "'proceed directly and proximately from the violation claimed and [are] not . . . attributable to some supervening cause.'" *See e.g. Wellman v. Dickinson*, 682 F.2d 355, 368 (2d Cir. 1982) (quoting *Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 719 (2d Cir. 1980)).[14] They are not correct. *Wellman* is distinguished

---

[14] Appellants also cite to a case from the Court of Appeals for the Tenth Circuit in which, relying on Supreme Court precedent, it required the District Court to use "[a]n approach that focuses on arriving at a figure that approximates the gain specifically resulting from Mr. Nacchio's offense [that] would better recognize 'the tangle of factors affecting price' that the Supreme Court addressed in [*Dura Pharmaceuticals*, *Inc.v,. Broudo*, 544 U.S. 336, 343 (2005)].'" *United States v. Nacchio,* 573 F.3d 1062, 1073-1075 (10th Cir. 2009). However, because this was a sentencing case in an insider trading criminal prosecution it is clearly inapposite because compliance with the amount-of-loss calculation in the Sentencing Guidelines was the central concern. *See* U.S.S.G. § 2B1.1(b)(1); *United States v. Peppel*, 707 F.3d 627, 642 (6th Cir. 2013). As the Sentencing Guidelines and a calculation of loss are not an issue in this case—for purposes of a remedy—no such concerns exists here. *See infra.* Moreover, its citation to *Dura Pharmaceuticals*—a private

---

by the fact that it is a private civil enforcement action brought under an implied right of action, and is therefore—for reasons we will further explain—unpersuasive.

All civil enforcement actions, whether initiated by the SEC or by a private party through an implied right of action share the same general goal: "to maintain public confidence in the marketplace." *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 345 (2005). Yet, this unity of purpose belies some fundamental differences. That distinctions exist between private and SEC civil enforcement actions is, by no means, revelatory.[15] Yet, since this is the primary reason that we invalidate the Appellants' assertion of direct causation analysis as a requirement here, it is necessary to go beyond a mere acknowledgement of the differences to examine how and why this is so.

Cases raised under an implied right in the Securities Acts rely upon analogous cases at common law. *See Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 63 (1975) ("[T]he conclusion that a private litigant could maintain an action for violation of the 1933 Act meant no more than that traditional remedies were available to redress any harm which he may

enforcement case—makes its general reference to civil cases similarly inopposite.

[15] *See e.g. Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 751 n.14 (1975); *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 391 (2d Cir.), cert. denied, 414 U.S. 910 (1973); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1096 & n. 15 (2d Cir. 1972); *see also S.E.C. v. Apuzzo*, 689 F.3d 204, 212 -213 (2d Cir. 2012).

have suffered; it provided no basis for dispensing with the showing required to obtain relief."). Indeed, while Section 13(d) and Section 10(b)—at issue here—did not incorporate common law fraud into federal law (*See Stoneridge Inv. Partners, LLC, v. Scientific-Atlanta Inc.*, 552 U.S. 148, 162 (2008)) an analogy has been applied virtually from the inception of implied-right cases between private enforcement actions and civil fraud claims. *See e.g. Dura Pharmaceuticals, Inc.,* 544 U.S. at 343; *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 744 (1975); *Kardon v. National Gypsum Co.*, 69 F.Supp. 512 (D.C. Pa. 1946). Accordingly, as we have long stated, "a plaintiff bringing suit under Section 10(b) and Rule 10b-5 must prove that the defendant i) made misstatements or omissions; ii) of material fact; iii) with scienter; iv) in connection with the purchase or sale of securities; v) upon which the plaintiff relied; and vi) that reliance proximately caused the plaintiff's injury." *In re Phillips Petroleum Securities. Litigation.,* 881 F.2d 1236, 1244 (3d Cir. 1989); *see also Manufacturers. Hanover Trust Co. v. Drysdale Securities Corp*., 801 F.2d 13, 20 (2d Cir. 1986).[16] *Wellman*, the case on which the Appellants rely,

---

[16] This association to civil fraud claims is also apparent in heightened pleading requirements applied to Section 10(b) claims (15 U.S.C. § 78bb(f)(1); Fed. R. Civ. P. 9(b)). Moreover, this nexus was explicitly reinforced by Congress' 1995 Private Securities Litigation Reform Act. 109 Stat 737, 15 U.S.C, § 78u–4(2). While the 1995 Act and its companion legislation in 1996 focus upon class action plaintiffs, these expectations for pleading have been applied to non-class plaintiffs as well. *Rodriguez-Ortiz v. Margo Caribe, Inc.,* 490 F.3d 92 (1st Cir. 2007).

takes it a step further. Denying the class plaintiff's motion for disgorgement, the court said: "Since class plaintiffs have not demonstrated that their alleged injury was <u>directly</u> <u>caused</u> by the Section 13(d) violation, the district court properly denied their claims for damages against Dickinson." *Wellman*, 682 F.2d at 368 (emphasis added).

In contrast, such comparisons to common law torts are not part of the jurisprudence or the statutory developments relating to SEC-initiated civil enforcement actions. Rather, SEC civil suits are described as "promot[ing] economic and social policies." *SEC v. Rind*, 991 F.2d 1486, 1490 (9th Cir. 1993). Courts have made it clear that the SEC pursues its claims "independent of the claims of individual investors." *Id.* The SEC has reinforced this notion, consistently stressing that "it is not a collection agency for defrauded investors." George W. Dent Jr., *Ancillary Relief in Federal Securities Law: A Study in Federal Remedies*, 67 Minn. L. Rev. 865, 930 (1983).[17] This has practical implications for the nature of civil suits brought by the SEC.

Stating the obvious, unlike private suits that redress the claims of particular shareholders: "the Commission is not an injured victim . . . ." *Whittemore*, 659 F.3d at 11 n.2. Therefore, in proving Section 13(d) and 10(b) violations, the Commission need not prove reliance, nor must it show that any investor lost money as a result of the violation. *SEC v. Morgan & Co., Inc.,* 678 F.3d 1233, 1244 (11th Cir. 2012) (citing *SEC v. Blavin,* 760 F.2d 706, 711 (6th Cir. 1985)).

---

[17] *But see* Black, Barbara, *Should the SEC Be a Collection Agency for Defrauded Investors?*, 63 Bus. Law 317 (2007-2008).

These factors have no relevance to the question of whether someone violated the law.  *Id.*  Rather, in the Section 10(b) context it must show:  "(1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with scienter."  *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007).

From all of this, we can easily conclude that the Appellants' reliance upon *Wellman* is misplaced.  While there is strong legal support for the application of tort-based proximate causation analysis in the context of private enforcement litigation, we have no such authority on which we can rely to impose any such requirement on SEC-initiated civil actions.  *See SEC v. Apuzzo*, 689 F.3d 204, 212-13 (2d Cir. 2012) (The court eschews the defendant's assertion of the need for evidence of proximate causation, because it is a concept that is derived from tort actions.).[18]

With that said, where the SEC seeks a disgorgement remedy, the difference between private enforcement suits and SEC suits does not entirely eliminate the need for proof of a causal connection between the securities violation and the disgorged funds.  The Court of Appeals for the District of Columbia Circuit correctly said:

> Since disgorgement primarily serves to prevent unjust enrichment, the court may exercise its equitable power only over property that is causally related to the wrongdoing.  The

---

[18] *See infra,* n. 22.

25

> remedy may well be a key to the SEC's efforts to deter others from violating the securities laws, but disgorgement may not be used punitively.

*SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1231 (D.C. Cir.1989).  Therefore, the more difficult question is whether, in spite of the separate lines of decisional law that ground private and SEC enforcement action, the doctrine of *novus actus interveniens* has any place in the causal analysis that is triggered by SEC motions for disgorgement?[19]  Our answer in the affirmative, with considerable qualification, is drawn from a deeper assessment of the constituent elements of causation.

It is important to "clearly [distinguish] for separate analysis the empirical issue of causal contribution and the normative issue of the extent of legal responsibility."  Richard W. Wright, *Once More into the Bramble Bush; Duty, Causal Contribution, and the Extent of Legal Responsibility*, 54 Vand. L.R. 1071, 1080 (2001).  "[T]he phrase 'proximate cause' is shorthand for the policy-based judgment that not all factual causes contributing to an injury should be legally cognizable causes."  *CSX Transp., Inc. v. McBride*, 131 S.Ct. 2630, 2642 (2011).  As a result, it is critical to account for the policy considerations that inform a particular approach to causation to ensure their compatibility with the policies that ground the cause of action.

---

[19] *See, e.g.,* H.L.A. Hart & A.M. Honoré*, Causation in the Law,* 73–74 (2d ed. 1985) pp. 73-74.

Assessing legal liability through the lens of direct causation requires that we first look to tort causation generally. Policies underlying the assignment of liability in tort law are by no means settled.[20] Nonetheless, it traditionally has been grounded in a balance of two goals: defining and deterring harmful conduct (consistent with prevailing social norms); and, redressing personal injury.[21] Yet, a third concern also has been given increasing weight over the years. "[T]he loss causation requirement-as with the foreseeability limitation in tort-'is intended to fix a legal limit on a person's responsibility even for wrongful acts.'" *Lentell v. Merrill Lynch  Co.,* 396 F.3d 161, 174 (2d Cir. 2005) (citation to quotation omitted). Direct causation, as a type of proximate causation, is focused upon limiting the liability of tortfeasors to the temporally and sequentially immediate consequences of an act.[22] It is rooted primarily in a concern to protect against a defendant's broad exposure to liability.

The widespread acceptance of tort-based approaches to causation regarding monetary remedies in private enforcement cases suggest that there is an alignment of the

---

[20] *See generally* Wright, 54 Vand. L.R. 1071; Jane Stapleton, *Choosing what we mean by "Causation" in the Law,* 73 Mo. L. R. 433 (2008).

[21] *See generally* Patrick J. Kelly*, Proximate Cause in Negligence Law:  History, Theory and the Present Darkness*, 69 Wash.U.L.Q. 49 (1991).

[22] W. Page Keeton et al. Prosser and Keeton on the Law of Torts, at 174-76 (5th Ed. 1984).

policies underlying the assignment of liability in both tort actions and private enforcement actions.[23]  Certainly, our review of private enforcement cases shows convergent policy interests in adequately compensating plaintiffs for injury, while simultaneously protecting defendants from broad liability, as in *Wellman*. [24]  Concerns also have been raised repeatedly about the abusive use of private enforcement and the negative impacts that such practices have on the market. *See LaSala v. Bordier et Cie*, 519 F.3d 121, 128 (3d Cir. 2008).  However, as we have already alluded to, the policies driving SEC-initiated civil enforcement suits are notably different.

---

[23] A private enforcement action is not at issue here, and we make no conclusions about the propriety of applying direct causation analysis to private enforcement suits.  We do note, however, that the  Supreme Court also provided some basis for caution in making an assumption about the compatibility of tort principles to private enforcement actions, highlighting that remedies in enforcement actions are grounded in equity. *Rondeau*, 422 U.S. at 61-65; *see also Bruschi v. Brown*, 876 F.2d 1526, 1530 n. 6 (11th Cir. 1989).

[24] *See e.g. Dura Pharmaceuticals, Inc.,* 544 U.S. at 345. ("[T]he statutes make [private enforcement suits] available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause."); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 81 (2006); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 313 (2007).

From the early days of the SEC's pursuit of restitution, its enforcement mission plainly has been front and center.

> While in rare cases, as an adjunct to injunctive relief, the Commission has urged a court to deprive violators of their illegal gains by directing that these be paid to individuals who have been injured by their violations, *even in such cases the Commission does not seek to make investors whole*; it seeks merely to deter violators by making violations unprofitable. Thus, the Commission recently stated in one such case that it was 'not acting on behalf of the * * * [injured parties] to seek money damages. * * *' It continued: 'As a law enforcement agency it is requesting disgorgement of profits illegally obtained, because effective deterrence requires more than an injunction limited to future violations.'

*Dolgow v. Anderson*, 43 F.R.D. 472, 483 (E.D.N.Y. 1968) *rev'd on other grounds*, 438 F.2d 825 (2d Cir. 1970)(quoting the SEC amicus brief).[25] Accordingly, the SEC's use of the

---

[25] *See also SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1308 (2d Cir.) *cert. denied,* 404 U.S. 1005 (1971), ( "It would severely defeat the purposes of the Act if a violator of Rule

disgorgement remedy has been constructed around two objectives: to '"deprive a wrongdoer of his unjust enrichment and to deter others from violating securities laws." *Hughes Capital Corp.*, 124 F.3d at 455 (quoting *First City,* 890 F2d at 1230). "[T]he court is not awarding damages to which plaintiff is legally entitled but is exercising the chancellor's discretion to prevent unjust enrichment." *SEC v. Commonwealth Sec., Inc.,* 574 F.2d 90, 95 (2d Cir. 1978). The goal is "not to compensate for losses but to deprive the wrongdoer of his ill-gotten gain." *Whittemore,* 659 F.3d at 11 n.2.[26]

---

10b-5 were allowed to retain the profits from his violation."); *Manor Nursing Centers, Inc*., 458 F.2d at 1104 ("The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable. The deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits."); *see also Rind,* 991 F.2d at 1490 ("The theory behind the [disgorgement] remedy is deterrence not compensation."*); see also First City,* 890 F.2d at 1232 n. 24 ("deterrence is the key objective"). For a general discussion of the development of the disgorgement remedy in SEC civil enforcement actions, s*ee* John D. Ellsworth*, "Disgorgement in Securities Fraud Actions Brought by the SEC*," 1977 Duke L. J. 641 (1977).

[26] In this sense, Justice Douglas' comments on divestiture in the antitrust context could be applied to the SEC's use of disgorgement: It is an "equitable remedy designed in the public interest to undo what could have been prevented had the defendants not outdistanced the government in their

Moreover, significantly, the absence of a particular concern in our review pointed to another policy difference. We did not see evidence of widespread concern that SEC-initiated enforcement actions were being used abusively. As a result, we could not find any jurisprudential basis to conclude that policies underlying SEC enforcement actions are focused upon limiting the defendant's exposure to remedial measures, beyond those imposed by general considerations of equity. *See e.g. First City Fin. Corp.,* 890 F.2d at 1231.

In light of all of these policy distinctions, it is unsurprising that the analytic framework for determining a remedy in an SEC enforcement suit is different from private suits, placing the consideration of intervening causation in a different posture. In *First City*, the court endorsed a burden shifting approach to causation in which the SEC is required to produce evidence supporting a reasonable approximation of "actual profits on the tainted transactions," which is essentially satisfying a but-for standard. *Id.* at 1231 This creates a presumption of illegal profits. *Id.* Once the SEC has made this showing, the burden shifts back to the defendant to "demonstrate that the disgorgement figure [is] not a reasonable approximation." *Id.* at 1232; *accord Hughes Capital Corp.,* 124 F.3d at 455.[27] The court added that "the

---

unlawful project." *Schine Chain Theatres v. U.S.*, 334 U.S. 110, 128 (1948).

[27] We read the term "reasonable approximation" in an equitable context, focusing on the fairness of the SEC's claim to disgorgement.

31

risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty." *Id*.; *see also* Rest. (Third) Restituion § 51(5)(d). In this context, *First City* cites to a case from the Court of Appeals for the First Circuit to elaborate that the defendant could make its case by "pointing to intervening events from the time of the violation." *Id.* (citing *SEC v. MacDonald*, 699 F.2d 47 (1st Cir. 1983)).

We draw two immediate points from *First City* and *MacDonald*. First, intervening causation is not an element of the SEC's evidentiary burden in setting out an amount to be disgorged that reasonably approximates illegal profits. Second, if the issue of an intervening cause is to be raised, it will normally be the defendant's burden to do so.

Yet, even where evidence relating to an intervening cause is raised, the Restatement (Third) of Restitution (on which the *First City* framework appears to be based) suggests that the court should consider such direct causation evidence only in light of other factors.[28] The Restatement envisions the court having wide discretion in deciding the amount to be disgorged: "In determining net profit [for purposes of disgorgement] the court may apply such tests of causation and remoteness . . . as reason and fairness dictate." Rest. (Third)

---

[28] Disgorgement is a type of restitution (*See Porter v. Warner Holding Co.,* 328 U.S. 395, 400-02 (1946)), and therefore the Rest. (Third) of Restitution provides a logical point of reference.

32

Restitution §51(5). [29]  Moreover, although the official comments to the Restatement say that a court "may deny recovery of particular elements of profit on the ground of remoteness" (*id.* at comment f), it counsels caution in giving the degree of attenuation between the wrongdoing and the monies to be disgorged inordinate weight:

> To say that a profit is directly attributable to the underlying wrong, or (as sometimes expressed) that the profit is the "proximate consequence" of the wrong, does not mean that the defendant's wrong is the exclusive or even the predominant source of the defendant's profit. Indeed, because the disgorgement remedy

---

[29] The use of the term "net profit" is siginificant, as it provides an indication of the boundary between remedial and punitive. *SEC v. Blatt,* 583 F.2d 1325, 1335 (5th Cir. 1978). "Profit includes any form of use value, proceeds, or consequential gains (§ 53) that is identifiable and measurable and not unduly remote."  Rest. (Third) Restitution § 51(4). Profit disgorgement (net benefit) is generally regarded as remedial and revenue disgorgement (gross benefit) is generally understood as outside the traditional realm of equity. *See Id.* § 51(4) & (5); *see also SEC v. Cherif,* 933 F.2d 403, 414 n. 10 (7th Cir. 1991); *see also* George P. Roach, "A Default Rule of Omnipotence:  Implied Jurisdiction and Exaggerated Remedies in Equity for Federal Agencies," 12 Fordham. J. Corp. & Fin. L. 1 (2007).

is usually invoked when the defendant's profits exceed the claimant's provable loss, it should be possible in almost every case to identify additional *causes* of the profit for which the defendant is liable.

*Id.* This point is elaborated upon in an example.

[I]f the defendant embezzles $100 and invests the money in shares that he later sells for $500, the $500 that the claimant recovers is largely the result of causes independent of the wrong: favorable market conditions and the defendant's investment acumen or simply luck. The determination in this easy case that the embezzler's profit is properly attributable to the underlying wrong rests on a number of related judgments. The first, evidently a matter of causation, is a finding (or a presumption) that the defendant would not have made the investment (and realized the profit) but for the wrong. But causation in this sense gives only part of the answer. The conclusion that the defendant's profit is

34

> properly attributable to the defendant's wrong depends equally on an implicit judgment that the claimant, rather than the wrongdoer, should in these circumstances obtain the benefit of the favorable market conditions, acumen, or luck, as the case may be. The conclusion draws further support from another implicit judgment, that there would be an incentive to embezzlement if the defendant were permitted to retain the profits realized in such a transaction.

*Id.*

In light of all of this (the statute, the jurisprudence, the Restatement, and the policies grounding disgorgement remedies in SEC enforcement suits), we are not persuaded by Appellants' argument that the SEC must do more than prove but-for causation to assert a reasonable approximation of illegal profits. Moreover, as to the role of proximate causation in the court's deliberation on SEC motions for disgorgement, we conclude that when evidence of an intervening cause is raised by the Defendant it is not dispositive. The policies underlying the disgorgement remedy—deterrence and preventing unjust enrichment—must always weigh heavily in the court's consideration of whether particular profits are legally attributable to the wrongdoing,

35

constituting unjust enrichment.[30]  It is within this context that the equitable power of the court to order disgorgement is properly exercised.  With this in mind, we turn to the evidence considered by the District Court.

The SEC introduced evidence of the Appellants violating Section 13(d) and Section 10(b), beginning on July 30, 1998, by intentionally misrepresenting Teo's beneficial ownership of shares held by the MAAA Trust, thereby underreporting the percentage of Musicland shares that he beneficially owned.  It also provided the court with evidence that the Appellants purchased 6.7 million Musicland shares after July 30, 1998, eventually achieving a combined ownership of over 35 percent of the company, all while falsely reporting that Teo did not have beneficial ownership of the MAAA shares.  Finally, the SEC documented that, while willfully still failing to correct the false filings, the Appellants sold all of the Musicland shares, obtaining over $21 million in profits from the portion of the shares that were tainted with reporting violations.  We agree with the District Court that this evidence presumptively demonstrated a reasonable approximation of the profits arising from transactions tainted by the Section 13(d) and Section 10(b) violations.[31]

---

[30] This conclusion is consistent with the fact that the Restatement allows for consequential gains in its definition of net profits.  Rest. (Third) Restitution § 51(5).

[31] In making this determination we take note that the District Court distinguished between profit that the Appellants earned from the sale of stock purchased before July 30, 1998, and stock earned after this date.  Additionally, in its final order, it

The Appellants did virtually nothing to rebut this presumption. They argued that the SEC failed to produce any evidence that the violations impacted the stock price. Yet, having established a reasonable approximation of the profits tainted by the violation, the SEC met its evidentiary burden. The Appellants also asserted that the Best Buy tender offer was the direct, intervening cause of their profits. However, it was the Appellants' burden to provide the District Court with evidence that the SEC's approximation of profits was unreasonable. This burden is not simply one of carrying the ball back across the fifty-yard line by presenting a merely plausible alternative explanation for the profit. Rather, the defendant must adduce—at a minimum—specific evidence explaining the interplay (or lack thereof) among the violation(s) at issue, the market valuation of the stock at fixed points in time, and any other cause for the profits they assert were untainted by illegality. In so doing, they must account for the ambiguities, uncertainties and myriad market forces inherent to any analysis of fluctuations in stock pricing to credibly demonstrate the unreasonableness of the government's proposed disgorgement. Here, it might have been possible for Appellants to demonstrate that intervening causes made the profits in question greatly attenuated from

---

reduced the disgorgement amount to account for the margin interest that the Appellants paid in connection with their trades of Musicland stock. In doing so, the District Court properly distinguished between legal and illegal profit, and simultaneously met the equitable requirement that the amount to be disgorged must be remedial rather than punitive. *Blatt,* 583 F.2d at 1335.

the violations at issue, but they failed to do so.[32]  Merely positing the Best Buy tender offer as an intervening cause and pointing to evidence that Appellants did not bring it about was insufficient to overcome the presumption established by the SEC that its approximation of illegal profits was reasonable.[33]

Nonetheless, even if the Appellants had provided evidentiary support that the Best Buy tender offer was the direct cause of all of their profits, it would not have changed our conclusion that the District Court was within its discretion to grant the SEC's motion for disgorgement.  As was noted in the example from the official comment to the Restatement:

> [The profit] that the claimant recover[ed] is largely the result of causes independent of the wrong:

---

[32] For example, Exhibit 12 to the Appellants' Memorandum in Opposition to the Motion for Disgorgement provides a transcript of the SEC's opening remarks at trial in which they state that the Best Buy tender offer provided a $5 per share premium over the market price.  However, the Appellants never referenced this figure in the body of their argument before the District Court, or before this Court, and no context was given to this figure.

[33] The equities of each case are assessed by the totality of the circumstances.  Suffice to say that, in this case, merely referencing the Best Buy tender offer only provided the District Court with the reason that the Appellants sold the tainted stock.

> favorable market conditions and
> the defendant's investment
> acumen or simply luck. The
> determination in this easy case
> that the . . . profit is properly
> attributable to the underlying
> wrong rests on a number of
> related judgments.

Rest. (Third) Restitution § 51 comment f. The Best Buy tender offer is likely one cause of the Appellants' profits. Yet, in the context of an SEC civil enforcement action, whether the Appellants' profit resulted directly—from a causal perspective—from the wrongdoing or from the operation of dumb luck is not dispositive on the question of whether it is proper and fair to regard those profits as tainted by the wrongdoing.[34] The court must make this judgment in equity, giving consideration to the elimination of unjust enrichment and the deterrent impact this action might have in

---

[34] The Appellants argued before the District Court "[t]hat the Defendants happened to still be holding Musicland shares a year and a half after July 1998, and at the time they increase in value because of the Best Buy offer, is therefore not a sufficient basis to permit disgorgement as a matter of law." To the contrary, the Appellants cannot now hide behind the time-span of their reporting violations and Teo's fraud as an "undue attenuation" that prevents disgorgement when the magnitude of their profit was made possible by the length and scope of their wrongdoing, permitting them to accumulate a large cache of shares without the market's awareness that resulted in enormous profit.

furthering future compliance with the Securities Exchange Act.

The SEC grounded its motion for disgorgement on Appellants' serial Section 13(d) violations over the course of years, and on the jury's conclusion that Teo's conduct was motivated by fraud, in violation of Section 10(b). While the Appellants were amassing Musicland shares, their collective misreporting and Teo's flagrant fraud insulated the valuation of the Appellants' Musicland stock holdings from the effects of a poison pill that could have been activated if the extent of their holdings in the company had been known. These were serious violations of Section 13(d) enabling the Appellants to acquire a sizeable ownership interest in a publically traded company without the awareness of company directors, fellow shareholders, the SEC, or the market-at-large. Moreover, all of this was done with conscious intent, violating Section 10(b). *See* Rest. (Third) Restitution § 53(2). These fraudulent acts enabled Appellants to surreptitiously acquire and hold a large volume of stock that, in turn, netted huge profits when sold to Best Buy. It is precisely this type of shadowy dealing that the Securities Exchange Act—and specifically Section 13(d) and Section 10(b)—was designed to combat in order to uphold the integrity of the stock market. In light of all of this, the District Court rightly judged the enforcement objectives to weigh decisively in favor of disgorgement. This decision was only made easier by the fact that the Appellants provided virtually no evidence to support a contrary conclusion. Moreover, by limiting the determination of unjust enrichment to only the shares acquired after the reporting violations began—leaving all other profit untouched—the District Court guarded against an

overreach that would have transformed the award into a punitive measure.

For all of these reasons, the District Court did not abuse its discretion by determining that the profit the Appellants realized from selling the stock they acquired while consciously violating the law unjustly enriched the Appellants, and that the enforcement objectives of this cause of action warranted ordering the Appellants to disgorge $17,422,054.13.

VI.

Finally, the Appellants challenge the District Court's order that they pay $14,649,034.89 in prejudgment interest. They generally stress that there is no need for any interest payment at all, but they focus their appellate argument on a challenge to the timeframe on which the interest is based and the use of the IRS tax underpayment rate to calculate the amount owed. It is within the District Court's equitable discretion to decide whether payment of interest should be ordered, and to decide upon both the interest rate and the period of time on which the interest will be calculated. *See SEC v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1476 (2d Cir. 1996).

The Appellants assert that the District Court's decision to award prejudgment interest from January 2001 through December 2011 was unfair, given their claims that over half of that time was due to delays that were either beyond their control, or were the result of holdups for which the SEC was solely responsible. However, given that the Appellants were

41

in control of their ill-gotten gains throughout this entire period, the District Court did not exceed its discretion in ruling that it had no evidence that a reduction in prejudgment interest for considerations of fairness was warranted.

We next examine the District Court's application of the IRS underpayment rate as the interest rate here. The SEC's request for this rate of interest on disgorged sums was consistent with its own regulation. 17 CFR § 201.600. We conclude that, as this is the rate that prevents unjust enrichment by approximating the interest rate for a loan (*See Id.* at 1476-77*; SEC v. Platforms Wireless Inter. Corp.*, 617 F.3d 1072, 1099 (9th Cir. 2010)), the District Court's choice of this rate was reasonable, and well within its discretion.

## VII.

For all of these reasons, we will affirm the Order of the District Court.

*SEC v. Teo*, No. 12-1168
JORDAN, *Circuit Judge*, dissenting in part

A court may exercise its equitable power to order disgorgement "only over … property causally related to the wrongdoing." *CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 78-79 (3d Cir. 1993) (internal quotation marks omitted). Because there is no legitimate dispute that Best Buy's tender offer was independent of the Appellants' securities law violations,[1] the profits on their sale of Musicland stock that are solely attributable to Best Buy's tender offer should not be subject to disgorgement. That is not to say that the balance of their profits is untainted. The remaining profits may well be subject to disgorgement to one degree or another, but whether they are or not is a determination that the District Court should make in the first instance, while properly addressing the question of causation. For that reason, I would vacate the District Court's disgorgement order and remand the case, and I therefore respectfully dissent from that part of the Majority's opinion that affirms the District Court's ruling on disgorgement.

"As an exercise of its equity powers, the court may order wrongdoers to disgorge their fraudulently obtained profits." *SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997). But "an order to disgorge is not a punitive measure; it is intended primarily to prevent unjust enrichment."

---

[1] Specifically, the jury found that Teo had violated the antifraud provisions of the Securities Exchange Act § 10(b) and Rule 10b-6, and that both Teo and the Trust had violated the reporting provisions of the Securities Exchange Act § 13(d) and Rules 13d-1 and 13d-2.

1

*Zacharias v. SEC*, 569 F.3d 458, 471 (D.C. Cir. 2009) (per curiam) (internal quotation marks omitted); *see also SEC v. Bilzerian*, 29 F.3d 689, 697 (D.C. Cir. 1994) (noting that disgorgement is aimed at "depriv[ing] the wrongdoer of his ill-gotten gain" (internal quotation marks omitted)). Given that the primary goal of disgorgement is to prevent unjust enrichment, the United States Court of Appeals for the District of Columbia Circuit observed in *SEC v. First City Financial Corp.* that there must be a causal relationship between the property to be disgorged and the proven wrongdoing. 890 F.2d 1215, 1231 (D.C. Cir. 1989). More specifically, there must "be a relationship between the amount of disgorgement and the amount of ill-gotten gain." *Am. Metals Exch.*, 991 F.2d at 79; *see also Bilzerian*, 29 F.3d at 696. That causal link is what makes disgorgement a remedial measure rather than a punitive one. As the Majority rightly acknowledges, "[t]he remedy may well be a key to the SEC's efforts to deter others from violating the securities laws, but disgorgement may not be used punitively." (Maj. Op. at 27 (quoting *First City*, 890 F.2d at 1231).)[2]

---

[2] It is well-established that "[r]etribution and deterrence are not legitimate nonpunitive governmental objectives." *United States v. Halper*, 490 U.S. 435, 449 (1989) (alteration in original) (quoting *Bell v. Wolfish,* 441 U.S. 520, 539, n.20 (1979)) (internal quotation marks omitted). Despite that, the notion that deterrence is an acceptable goal of disgorgement has entered our jurisprudence via *First City. See, e.g.*, *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997) ("Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating securities

The Appellants rely on *Wellman v. Dickinson*, 682 F.2d 355 (2d Cir. 1982), to argue that "the SEC bears the burden of demonstrating that the profits sought to be disgorged 'proceed *directly* and proximately from the violation claimed.'"[3] (Appellants' Opening Br. at 58 (quoting *Wellman*, 682 F.2d at 368).) The Majority answers by distinguishing *Wellman*, and I accept my colleagues' conclusion that a direct and proximate causation standard is not applicable in this case, that a lower "but-for" standard of causation will suffice. The Majority also adopts the burden-shifting framework from *First City*, in which the SEC has the initial burden of showing "a reasonable approximation of 'actual profits on the tainted transactions,' … [which] creates a presumption of illegal profits." (Maj. Op. at 33 (quoting *First City*, 890 F.2d at 1231).) Implicit in the statement that the transactions are "tainted," though, is a recognition that the SEC must have satisfied its initial burden of showing causation by producing evidence that a violation occurred and

laws." (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989)) (internal quotation marks omitted)).

[3] The Appellants do not dispute that disgorgement is an appropriate remedy when, as in this case, a defendant has violated §§ 10(b) and 13(d) of the Securities Exchange Act, nor could they credibly do so. *See, e.g.*, *First City*, 890 F.2d at 1230 ("[D]isgorgement is rather routinely ordered for insider trading violations … [and] [w]e … see no relevant distinction between disgorgement of inside trading profits and disgorgement of post-section 13(d) violation profits."); *SEC v. Bilzerian*, 814 F. Supp. 116, 121 (D.D.C. 1993), *aff'd*, 29 F.3d 689 ("Defendant must disgorge the profits he obtained as a result of … violations [of §§ 10(b) and 13(d)].").

that some plausible relationship exists between that violation and the profits gained.

With that showing, it may be "proper to assume that all profits gained while defendants were in violation of the law constitute[] ill-gotten gains," *SEC v. Bilzerian*, 814 F. Supp. 116, 121 (D.D.C. 1993), *aff'd*, 29 F.3d 689. Hence, as the Majority holds, the SEC's initial burden can be satisfied by demonstrating that, but for a defendant's illegal actions, the profits would have been different. That is a sensible approach, as the risk of uncertainty about how differently events would have unfolded "should fall on the wrongdoer whose illegal conduct created that uncertainty." *First City*, 890 F.2d at 1232; *see also SEC v. MacDonald*, 699 F.2d 47, 55 (1st Cir. 1983) (en banc) (adhering to the principle that "doubts are to be resolved against the defrauding party").

Here, the SEC made a showing that the shares of Musicland stock that the Appellants acquired after July 30, 1998, were tainted because, but for the Appellants' failure to properly disclose information, the Appellants would have obtained their shares of Musicland stock under different and presumably more expensive market conditions. Had, for example, Teo disclosed his true beneficial ownership and his plans to change Musicland's Board or take Musicland private, Musicland's stock price may well have increased. To the extent the Majority relies on such reasoning, I agree with them that the SEC met its initial burden to establish that a plausible relationship exists between the Appellants' securities violations and the profits gained.[4]

---

[4] I use the term "profits gained" as shorthand for the $17,422,054.13 in net profits, excluding margin interest paid,

But disgorgement is not an all-or-nothing matter. Again, only the extent of profits with a causal connection to the wrongdoing – *i.e.*, the ill-gotten gains – are subject to disgorgement. *See MacDonald*, 699 F.2d at 55 (holding that not all subsequent profits are subject to disgorgement, only those "based upon the price of [the] stock a reasonable time after public dissemination of the inside information"). Thus, once the SEC has made the initial showing required to presumptively establish causation, "the burden shifts … to the defendant to 'demonstrate that the disgorgement figure [is] not a reasonable approximation.'" (Maj. Op. at 33 (alteration in original) (quoting *First City*, 890 F.2d at 1232).) That burden warrants some clarification. When the SEC comes forward with a reasonable approximation of tainted profits, the burden of production then shifts to the defendant to produce evidence showing that all or some part of the sum in question should not be subject to disgorgement. As the court in *First City* explained, a defendant must show that "the disgorgement figure [i]s not a reasonable approximation … , for instance, by pointing to intervening events from the time of the violation." *See First City*, 890 F.2d at 1232. Proof of an intervening cause is therefore one way that a defendant can challenge a disgorgement calculation, because an intervening cause indicates that not all of the profits are, in fact, tainted by wrongdoing.

Here is where it seems I part from my colleagues' view of the case. It is true that the SEC met its initial burden of showing that some plausible relationship exists between

that the District Court determined were not already subject to the penalties imposed in connection with Teo's insider trading conviction.

5

the Appellants' violations and the profits they gained. However, it is also true that the Appellants then pointed to the Best Buy tender offer as an independent cause. Neither the District Court nor the Majority appropriately accounts for the Best Buy tender offer. While the Majority pays lip service to the limiting principle that, to avoid being a punitive measure, a disgorgement order must be limited to ill-gotten gains, my colleagues do not actually apply that principle to the admitted premium associated with the Best Buy transaction.[5]

The Majority states that "[t]he Appellants do not appeal the calculation of the disgorgement, but rather assert the District Court wrongly granted the SEC's motion for this remedy." (Maj. Op. at 22.) Admittedly, at oral argument the Appellants called the causation analysis a threshold issue, separate from the calculation of disgorgement. But the Appellants' submission of an independent cause is perfectly sensible as a challenge to the calculation of a disgorgement figure: implicit in their argument is the notion that the District Court's disgorgement figure is incorrect and that they should not be penalized with respect to the Best Buy transaction. *Cf. Am. Metals Exch.*, 991 F.2d at 79 ("*In crafting any*

---

[5] Used in the context of a tender offer, a "premium" is generally the "amount over market value paid." John Downes & Jordan Elliot Goodman, *Dictionary of Finance and Investment Terms* 531 (7th ed. 2006). In other words, it is the amount that Best Buy paid for Musicland's stock in excess of the stock's trading value at the time of the tender offer. The Majority cites "a $5 per share premium over the market price" (Maj. Op. at 39 n.32), and the SEC seems to place the premium at $4.55 per share, or "a 60% takeover premium" (Appellee's Br. at 62).

*disgorgement remedy* on remand, the district court should keep in mind the limitation placed on its equitable powers by th[e] requirement that there be a relationship between the amount of disgorgement and the amount of ill-gotten gain." (emphasis added)); *First City*, 890 F.2d at 1230 (addressing intervening causes within "the question of how the court measures th[e] illegal profits"); *Bilzerian*, 814 F. Supp. at 121 (discussing intervening causes within "[t]he sole remaining issue [of] what portion of the[] profits is subject to disgorgement").    Indeed, my colleagues consider the Appellants' evidentiary burden in the context of showing that a "disgorgement *figure*" is an unreasonable "approximation of profits" (Maj. Op. at 33, 39 (emphasis added)).    On the briefing and record before us, the Appellants' independent-cause argument fairly calls into question the disgorgement figure.[6]

The Best Buy tender offer is clearly an independent and intervening event.    It bears no relationship to the Appellants' securities violations.    According to Musicland's CEO, Teo "had nothing to do with finding Best Buy" (J.A. at 318) and was neither involved in the initial discussions nor informed about them by Musicland.    In addition, Best Buy

---

[6] My colleagues view the Appellants' argument as an effort to rebut the SEC's showing of but-for causation in the burden-shifting framework that they have adopted.    I agree that it aims to rebut causation.    The Appellants expressly argue that they "would not have earned [their] profits had Best Buy not made its tender offer" and, thus, point to a break in causation.  (Appellants' Opening Br. at 66.)    That does not mean, however, that the argument is irrelevant when considering the extent of disgorgement.

was fully aware of the combined ownership of Teo and the Trust, notwithstanding Teo's public disclaimer of beneficial ownership of the Trust's shares, and Best Buy required both Appellants to sign "Shareholder Support Agreements" to tender or otherwise sell all of their Musicland shares in connection with Best Buy's planned tender offer. (J.A. at 751-57, 758-64, 1814.) The Appellants have consistently – and, in light of those facts, credibly – maintained that the Best Buy tender offer constitutes an entirely independent cause of profit on their stock.

Nevertheless, the District Court's comment as to a connection between the Appellants' violations and the Best Buy transaction was that "the Best Buy tender offer constituted a market correction that Teo anticipated when he bought what he considered to be undervalued shares," as if anticipating that shares are undervalued were, in itself, somehow inappropriate. (J.A. at 20.) Making a profit on undervalued shares, however, is a strategy pursued by law-abiding investors all the time. There is nothing suspect about it. No logical reason has been proposed by anyone for presuming a connection between the Appellants' profit associated with the Best Buy tender offer and any wrongdoing. The Majority, meanwhile, faults the Appellants for "[m]erely positing the Best Buy tender offer as an intervening cause." (Maj. Op. at 39-40.) But the Appellants have not simply uttered the words "Best Buy." They have cogently explained, with citations to the record, why the Best Buy tender offer was independent of all action (or inaction) on their part. (*See* Appellants' Opening Br. at 65-66 (citing J.A. at 318, 705, 708-10).) In light of the undisputed facts, it is difficult to fathom how the Best Buy tender offer could be anything other than an independent cause.

8

The Majority states, without any supporting authority, that the Appellants' "burden is not simply one of carrying the ball back across the fifty-yard line" but one of "adduc[ing] – at a minimum – specific evidence explaining the interplay (or lack thereof) among the violation(s) at issue." (Maj. Op. at 39.) I fundamentally disagree with that assertion. It is axiomatic that "the SEC bears the ultimate burden of persuasion." *First City*, 890 F.2d at 1232. Therefore, once a defendant has pushed back with evidence of what is more likely than not an intervening cause, it is the SEC's responsibility to carry the ball.

Again, a key point that is lost in the Majority's football analogy is that disgorgement is not an all-or-nothing proposition. While, "[i]n the insider trading context, courts typically require the violator to return all profits made on the illegal trades," *id.* at 1231, courts may limit disgorgement to an amount based on the price of the stock "a reasonable time after public dissemination of the inside information," *MacDonald*, 699 F.2d at 55. For example, in *MacDonald*, the appellant had violated the antifraud provisions of § 10(b) of the Exchange Act by purchasing a company's stock without disclosing the fact that the company would be acquiring an office building and likely negotiating a profitable long-term lease of space in that building. *Id.* at 48. When the company publicly announced that acquisition and potential lease the following day, the price of the stock jumped. *Id.* at 49. The appellant held on to the stock for more than a year, after which he sold at an even higher price. *Id.*

On appeal, the First Circuit, sitting en banc, considered the question of

9

> whether, where [a defendant] fraudulently purchased company shares while in possession of material non-public information[,] [he should be required, in an action brought by the Commission,] to disgorge the entire profits he realized from his subsequent sale of those securities about a year later, rather than limiting disgorgement to an amount representing the increased value of the shares at a reasonable time after public dissemination of the information.

*Id.* at 52 (third alteration in original) (internal quotation marks omitted). The court answered in the negative, holding that profits made as a result of stock price increases after a reasonable time following the disclosure of inside information "are purely new matter" and not subject to disgorgement. *Id.* at 54. "To call the additional profits made by the insider who held until the price went higher 'ill-gotten gains,' or 'unjust enrichment,' is merely to give a dog a bad name and hang him." *Id.*

To illustrate, the *MacDonald* court presented two hypotheticals, both under the assumption that an insider fraudulently bought stock at $4 per share and that, for the entire month after the inside information became public, the stock sold at $5 per share. *Id.* at 52. In the first scenario, the insider sold the stock for $5 during that month. *Id.* For this scenario, the court reasoned that the SEC could properly seek $1 per share as ill-gotten gains. *Id.* The court then posited a second scenario in which the stock price later increased to $10 per share, at which point the insider sold his shares. *Id.*

10

The SEC argued that the disgorgement in this second scenario – analogous to the exact facts before the *MacDonald* court – should be $6 per share. *Id.* The court, however, disagreed with the SEC's assertion, noting that to award the entire actual profits as disgorgement would be to measure disgorgement "by purely fortuitous circumstances." *Id.* at 54. The court held that the "further profits were not causally related" to the wrongdoing and that, "absent some special circumstances," an insider's subsequent decision to retain his original investment should not create any "legal or equitable difference." *Id.* Therefore, the court concluded that "[t]here should be a cut-off date" for the profits to be disgorged and remanded for the district court to "determine a [disgorgement] figure based upon the price of [the] stock a reasonable time after public dissemination of the inside information." *Id.* at 54-55; *see also SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972) (refusing to extend disgorgement to income subsequently earned on the initial illegal proceeds).

By limiting disgorgement to a reasonable time after public dissemination of inside information, the court in *MacDonald* soundly cordoned off profits that were too attenuated from the non-disclosure and insulated them from disgorgement. *MacDonald* therefore stands for the proposition that, when there is a clear break in causation, only profits attained prior to that break are subject to disgorgement. Any additional profits, coming as they do from fortuitous circumstances, are not sufficiently related to the wrongdoing to be subject to disgorgement.

Unlike in *MacDonald*, the information that the Appellants withheld in this case was not later released to the

11

market. Nevertheless, the premium that Best Buy offered was unrelated to the wrongdoing at issue and created an analogous causal break.[7] As we have previously emphasized, "[i]n crafting any disgorgement remedy ... , the district court should keep in mind the limitation placed on its equitable powers by th[e] requirement that there be a relationship between the amount of disgorgement and the amount of ill-gotten gain." *Am. Metals Exch.*, 991 F.2d at 79. By awarding disgorgement on the profits related to the Best Buy transaction, the District Court abused its discretion.[8] And by

---

[7] What sort of fortuitous event might constitute an intervening cause is not a question that lends itself to a broadly applicable response. Such a determination is fact-specific. Looking at the facts of this case, I am confident that the Best Buy transaction is an intervening cause. It had an obvious and discernible market effect that can, and has, been estimated by both the Majority and the SEC. Perhaps that is why the SEC confines itself to arguing that the Appellants should not avoid disgorgement entirely, rather than contending that the Appellants' violations and the Best Buy tender offer are causally linked.

[8] A challenge to the calculation of a disgorgement award based on findings of fact is subject to clear error review, *SEC v. Whittemore*, 659 F.3d 1, 9 (D.C. Cir. 2011), but we are addressing the Appellants' challenge that the District Court did not properly limit the disgorgement award such that the Court overreached its equitable powers. The Majority is thus correct that an "abuse of discretion" standard applies. *Id.* With respect to calculating disgorgement, it bears repeating that, "despite sophisticated econometric modeling, predicting stock market responses to alternative variables is[] ... at best speculative. Rules for calculating

12

failing to limit disgorgement to ill-gotten gains, my colleagues effectively endorse a penalty assessment, in the name of enforcing federal securities law. Accordingly, I dissent.[9]

---

disgorgement must recognize that separating legal from illegal profits exactly may at times be a near-impossible task." *First City*, 890 F.2d at 1231. For that reason, courts "have rejected calls to restrict disgorgement to the precise impact of the illegal trading on the market price," and the amount of disgorgement "need only be a reasonable approximation of profits causally connected to the violation." *Id.* at 1231-32.

[9] Because the SEC sought, and the District Court imposed, a civil penalty equal to the amount of disgorgement, remanding the disgorgement award may have an effect on the civil penalty. The prejudgment interest on both amounts would also presumably be affected by a change in the disgorgement figure.

13